[Cite as *State v. Penny*, 2011-Ohio-5975.]

IN THE COURT OF APPEALS FOR MIAMI COUNTY, OHIO

STATE OF OHIO                                    :

    Plaintiff-Appellee                       :       C.A. CASE NO. 2010 CA 37

v.                                               :       T.C. NO.   10CR207B

JOSHUA A. PENNY                                  :       (Criminal appeal from
                                     Common Pleas Court)
    Defendant-Appellant                      :

                                               :

          . . . . . . . . . .

**O P I N I O N**

Rendered on the   18th   day of    November   , 2011.

          . . . . . . . . . .

JAMES D. BENNETT, Atty. Reg. No. 0022729, Assistant Prosecuting Attorney, 201 West Main Street, Safety Building, Troy, Ohio 45373
       Attorney for Plaintiff-Appellee

STEPHANIE A. GUNTER, Atty. Reg. No. 0070436, 429 N. Main Street, Piqua, Ohio 45356
       Attorney for Defendant-Appellant

          . . . . . . . . . .

FROELICH, J.

{¶ 1}   Joshua A. Penny was convicted by a jury in the Miami County Court of Common Pleas of receiving stolen property in the amount of $500 or more but less than $5,000. The trial court sentenced him to eight months in prison and ordered him to pay

court costs. Penny appeals from his conviction. For the following reasons, the trial court's judgment will be affirmed.

I

{¶ 2} Penny was tried jointly with a co-defendant, Corey Plunkett, who was also convicted of receiving stolen property. The State's case against them consisted of the testimony of another co-defendant, Dustin Hughes ("Hughes"); Hughes's uncle, Michael Hughes; the victim, Nicholas Edmiston; and Detective Richard Byron of the Piqua Police Department. Penny testified in his own defense. Plunkett also testified on his own behalf and called Chelsea Grubb, Hughes's former girlfriend and one of Plunkett's close friends, as a witness. In addressing Plunkett's direct appeal from his conviction, we summarized the evidence as follows:

{¶ 3} "At the trial, Dustin Hughes testified that he, in connection with the above offenses, was originally charged with complicity to burglary, a felony of the second degree, and that pursuant to an agreement with the State, he pled guilty to an amended charge of breaking and entering, a felony of the fifth degree, in exchange for his testimony at the trial of Plunkett and Penny. According to Hughes, on the afternoon of June 12, 2010, he, Chelsea Grubb, Plunkett and Penny drove around Piqua in his car, 'smoking dope.' They stopped at Z's bar for a few drinks, then they returned to the car, and he drove Grubb home. Plunkett and Penny then asked him if he could 'get rid of' a Play Station 3 for them, and he agreed to do so. Hughes testified that he drove to the home of Nicholas Edmiston, dropping Plunkett and Penny off, knowing that they were going to take the Play Station 3 and some pain pills. Shortly thereafter, Hughes received a text message from Plunkett, telling him to

drive around the corner and pick him and Penny up. According to Hughes, the men [, i.e., Plunkett and Penny] were carrying the Play Station 3 and a box containing video games. They told Hughes that Edmiston was not at home.

{¶ 4} "Hughes drove to Plunkett's home, and they put the items in Plunkett's car. Hughes testified that Plunkett and Penny wanted to return to Edmiston's house to steal his 60 inch television, but Hughes was 'too scared.' The men then returned to Z's for a while, and encountered Edmiston there. Hughes, Plunkett, Penny and Edmiston then drove to a motel in Troy to continue drinking, picking up Grubb on the way. Later, Hughes and Penny stayed at the motel while Grubb drove the others back to Piqua.

{¶ 5} "Hughes testified that his uncle, Mike Hughes, had indicated to him that he wanted to buy a Play Station 3, and [Hughes] contacted [his uncle] and told him that he knew of one for sale. A couple of days after the theft, Hughes drove Penny and Plunkett to Sidney to Mike Hughes' home, and all three men went inside and set up the Play Station 3. Hughes testified that his uncle gave Penny and Plunkett $260.00 for the Play Station 3 and some games. Later, Hughes testified that he observed a gold ring with diamonds in Plunkett's possession, and Plunkett indicated that he had retrieved it from Edmiston's house.

{¶ 6} "Several days later, Hughes testified that Detective Richard Byron of the Piqua Police Department interviewed him about the Play Station 3, and Hughes testified that he initially lied to Byron before telling him the truth about what happened.

{¶ 7} "Mike Hughes testified that he had been looking for a Play Station 3 for his children, and that he told Hughes to call him if he knew of one for sale. Following a phone conversation [ with Hughes], Mike Hughes stated that Hughes, Penny and Plunkett arrived at

his home on June 14, 2010. All three men entered the home together, according to Mike Hughes. He testified that he was told [by Penny] that the Play Station 3 belonged to Penny's cousin. Mike Hughes stated he gave $260.00 to Penny for the system, two controllers, a power cord and 8 games, plus $20.00 for gas money. [Mike Hughes asked Penny if his cousin would take less for the items, but Penny responded that they were firm on the price.] According to Mike Hughes, he asked the men three times if the items were stolen[; all three responded that the items were not.] Mike Hughes stated that a week or ten days later, Detective Byron came to his residence, asked him about the items and retrieved them from him.

{¶ 8} "Nick Edmiston testified that his home was burglarized and his front door was damaged. Edmiston testified that he went to Z's bar at around 10:00 p.m. on the night of the incident, and that he did not return home until 2:30 a.m. Edmiston reported to the police that his Play Station 3, two remotes, 12 to 15 games, a necklace and bracelet set, a gold diamond ring and an iPod Touch were missing from his home. Edmiston stated that he knew Plunkett and Penny, but not Hughes. On the night of the burglary, Edmiston testified that he 'had gotten in contact with Josh through Corey's phone, *** to come to Z's and play pool. They didn't show up for a while so I called back and ask[ed] if they were coming and yeah they did show up but it was a while after, I don't know, maybe a couple hours after I talked to them.' Edmiston stated that Penny and Plunkett arrived with Hughes, and the men played pool for two hours and then went to the motel in Troy.

{¶ 9} "Edmiston identified his Play Station 3 and eight games at trial, and he testified that he received an insurance check for $2137.51 for everything that was taken. He

stated that he received $285.01 for the Play Station 3, 'thirty to forty apiece' for some of the games, and $29.96 for the controller. Edmiston testified that he originally paid $60.00 for most of the games that were taken. On cross-examination, Edmiston testified that he never observed Plunkett with the Play Station 3 or the games. Edmiston testified that after Plunkett arrived at Z's, Edmiston did not lose sight of him. Regarding his games, Edmiston specifically stated that he received from his insurance company $29.96 for 'NBA 2K9,' $29.99 for 'Need for Speed,' $60.00 for 'Tiger Woods Golf 2010,' $59.99 for 'XXX Street,' $49.99 for 'Fall Out Three,' and $59.96 for 'USB 2009.'

{¶ 10} "Detective Richard Byron testified that as a result of receiving anonymous information in a phone call, he proceeded to the home of Mike Hughes, where he retrieved the Play Station 3, power cord, two controllers and some games. Byron stated that he then interviewed Hughes, and then he went to Plunkett's parents' residence where he was given permission to search Plunkett's bedroom and car. Nothing was recovered as a result of the search.

{¶ 11} "Plunkett testified that on June 11, 2010, he, Grubb, Hughes and Penny were riding around, and they decided to go to the mud bogs in Shelby County. Plunkett stated they were in Sidney when Edmiston called and asked them to come play pool and drink beer at Z's bar. They drove to Z's and arrived 20-30 minutes later, according to Plunkett. When they arrived, Plunkett and Penny entered the bar, and Hughes and Grubb left so that Grubb could change clothes. Plunkett stated that Hughes and Grubb were gone for about an hour, and then they returned to the bar. Plunkett stated that he had a friend who was managing a Comfort Suites motel in Troy, and the group of men and Grubb, along with an

additional friend of Edmiston's, went there to swim until around 3:00 a.m. At that time, Plunkett and Grubb drove Plunkett's car back to Edmiston's house, where they dropped off Edmiston and his friend.

{¶ 12} "Plunkett testified that a couple of days later, Hughes told him that he was selling a Play Station for a friend of his to his uncle, and he told Plunkett that he would give him money for gas if Plunkett drove him to the home of his uncle. Plunkett stated that he drove Hughes, along with Penny, to Mike Hughes' home. Upon arrival, Plunkett testified that Hughes told him and Penny to stay in the car, and he carried a box containing the Play Station inside. After a few minutes, Plunkett testified that Hughes came to the door and waived him and Penny inside. Plunkett testified that he did not receive any money from the sale of the items, and that Hughes put ten dollars worth of gas in his car. Plunkett stated that he did not know that the Play Station 3 and the games were stolen, and he denied that Mike Hughes was told that the Play Station belonged to Penny's cousin.

{¶ 13} "Grubb testified that Hughes is the father of her children, and that Plunkett is one of her best friends. She stated that on the date of the incident, she got off work at 2:00 p.m., and that she, Hughes, Plunkett and Penny drove around and then headed to the mud bogs in Sidney. She testified that they drove to Z's bar at around 10:00 p.m. Grubb stated that she and Hughes were at the bar for five or ten minutes, and then they left so that she could go home and change her clothes. She testified that she and Hughes left Plunkett and Penny at the bar with Edmiston. Grubb stated that Hughes then left her at her house, and he returned an hour later, after she took a shower, to pick her up. Grubb and Hughes then returned to the bar and drove Edmiston and a friend of his to the hotel in Troy, according to

Grubb.   Later, she stated that she and Plunkett drove Edmiston and his friend home and then returned to the hotel to pick up the rest of the group.

{¶ 14} "Penny testified that Plunkett is his cousin.   Penny's testimony was consistent with Plunkett's regarding the sequence of events, namely that Penny, Plunkett, Hughes and Grubb drove from Sidney to Z's bar after receiving a phone call from Edmiston, in '20, 25 minutes.'   Penny testified that he and Plunkett were with Edmiston the remainder of the evening, and that Hughes and Grubb left so that Grubb could take a shower, and that they later returned.   Penny testified that the group went to the motel in Troy.

{¶ 15} "Penny further stated that he accompanied Hughes, along with Plunkett, to Mike Hughes' house so that Hughes could sell the Play Station 3 items 'for his friend.' Penny stated that he did not know that the items were stolen.   According to Penny, he and Plunkett initially remained in the car at Mike Hughes' house until Hughes waived them inside.   Penny stated that Mike Hughes handed cash to Hughes in the driveway as the men were leaving."   *State v. Plunkett*, Miami App. No. 2010 CA 38, 2011-Ohio-5071, ¶2-14.

{¶ 16} As stated above, the jury convicted Penny of receiving stolen property in an amount of $500 or more but less than $5,000.   He was sentenced accordingly.

II

{¶ 17} Penny claims that his conviction was based on insufficient evidence and was against the manifest weight of the evidence.

{¶ 18} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, Montgomery App. No.

22581, 2009-Ohio-525, ¶10, citing *State v. Thompkins,* 78 Ohio St.3d 380, 386, 1997-Ohio-52. When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis*, 79 Ohio St.3d 421, 430, 1997-Ohio-372, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 19} In contrast to the sufficiency of the evidence standard, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *Wilson* at ¶12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175.

{¶ 20} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id.

{¶ 21} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin,* 20 Ohio App.3d at 175.

{¶ 22} Penny asserts that he did not know or have reason to believe that the Play Station 3 and the games were stolen and that Dustin Hughes was the only individual to receive any proceeds from the sale of the Play Station 3 console and games. Penny thus claims that the State did not prove beyond a reasonable doubt that he received stolen property. Penny further argues that the State did not prove that the value of the property was $500 or more. He notes that the State did not produce any receipts for the value of the property, nor did it present evidence of replacement costs. Penny asserts that, at most, he should have been convicted of a misdemeanor.

{¶ 23} R.C. 2913.51(A) provides: "No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense." Unless otherwise provided by statute, receiving stolen property is a misdemeanor of the first degree. R.C. 2913.51(C). At the time of Penny's conviction, R.C. 2913.51(C) provided that, if the value of the property at issue is $500 or more and is less than $5,000, receiving stolen property is a felony of the fifth degree.[1] Former R.C. 2913.51(C).

{¶ 24} R.C. 2913.61 addresses the value of stolen property and, in particular, R.C.

---

[1]R.C. 2913.51 was amended, effective September 30, 2011. Under the current version, receiving stolen property becomes a fifth degree felony if the value of the property involved is $1,000 or more and is less than $7,500.

2913.61(D)(1)-(3) set forth alternative criteria to be used in determining the value of property involved in a theft offense. That section provides in relevant part:

{¶ 25} "(2) The value of personal effects and household goods ***, which property is not covered under division (1) of this section and which retains substantial utility for its purpose regardless of its age or condition, is the cost of replacing the property with new property of like kind and quality."

{¶ 26} After thoroughly reviewing the entire record, weighing all the evidence and reasonable inferences, we conclude that the jury reasonably concluded that Penny committed the offense of receiving stolen property. Edmiston testified that he knew Plunkett and Penny, and he had texted them about meeting him at Z's. Although Plunkett and Penny responded that they would come, Edmiston waited "a couple of hours" before they met him. Hughes testified that Plunkett and Penny asked Hughes if he could "get rid of" a Play Station 3 for them, and Hughes agreed to do so. Hughes testified that he drove Plunkett and Penny to Edmiston's home, knowing that they were going to take the Play Station 3 and some pain pills. Hughes stated that Plunkett and Penny returned to the car with the Play Station 3 and a box containing video games, and the men stated that Edmiston was not at home. Hughes stated that Mike Hughes gave Penny and Plunkett $260.00 for the Play Station items, which was consistent with Mike Hughes's testimony. Mike Hughes also testified that Penny represented that the items belonged to his (Penny's) cousin.

{¶ 27} Viewing the evidence in the light most favorable to the State, there was sufficient evidence to support Penny's conviction for receiving stolen property. And, although Plunkett, Grubb, and Penny testified to a different version of events, the jury did

not lose its way simply because it chose to believe the State's version of events, rather than the version of events presented by the defense. We defer to the jury's assessment of credibility. Penny's conviction was not against the manifest weight of the evidence.

{¶ 28} Penny also claims that the State did not prove beyond a reasonable doubt that the value of the stolen property was $500 or more but less than $5,000. Plunkett raised the same issue in his direct appeal, and we rejected it, reasoning:

{¶ 29} "Regarding Plunkett's assertion that he is entitled to a reduction in the degree of offense to a misdemeanor due to the State's alleged failure to prove the value of the property, we disagree. Edmiston testified that he paid $60.00 for most of the 12-15 video games that were stolen. Additionally, the jury viewed eight games that were recovered, as well as the Play Station 3. Although the trial court did not admit the insurance settlement document, Edmiston testified without objection that his insurance company valued the Play Station 3 at $285.00, and that he received approximately $290.00 for six games, plus $29.96 for the controller. Thus, the evidence was sufficient for the jury to conclude that the value of the property was over $500.00." *Plunkett* at ¶27.

{¶ 30} We find this reasoning in *Plunkett* to be applicable to Penny's appeal. For the same reasons, we conclude that there was sufficient evidence to prove that the value of the stolen property was $500 or more and less than $5,000. Penny was properly convicted of receiving stolen property, a fifth degree felony

{¶ 31} Penny's assignment of error is overruled.

III

{¶ 32} The trial court's judgment will be affirmed.

. . . . . . . . . .

FAIN, J. and DONOVAN, J., concur.

Copies mailed to:

James D. Bennett
Stephanie A. Gunter
Hon. Robert J. Lindeman